UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

CORNELL E. HERBERT,

    Plaintiff,

    v.

UNIVERSITY OF MARYLAND,

    Defendant.

Civil Action No. TDC-22-1186

**MEMORANDUM OPINION**

Plaintiff Cornell Herbert has filed suit against Defendant University of Maryland ("the University"), located in College Park, Maryland, alleging employment discrimination based on race and a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 (2018), and unlawful retaliation, in violation of Title VII and the Americans with Disabilities Act, 42 U.S.C. § 12203. The University has filed a Motion to Dismiss, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the University's Motion to Dismiss will be GRANTED.

**BACKGROUND**

**I.    Factual Background**

Plaintiff Cornell Herbert is a Black man who, at the relevant times, was employed as a painter for the University. In the spring of 2019, Herbert was placed on light duty after he had rotator cuff surgery. When his physician authorized him to return to full duty, Herbert attempted to submit paperwork to effectuate the change to Faith Bagnall, the University's Staff Relations

Manager. Bagnall, who is white, refused to accept the paperwork because a nurse rather than a doctor had signed the paperwork. Herbert had to engage other human resources staff to assist in securing authorization to return to full duty. According to Herbert, after that incident, Bagnall "targeted and discriminated against" him. Am. Compl. ¶ 25, ECF No. 13.

Prior to July 2019, Herbert was involved in an altercation involving two co-workers, Eddie Marquez, who is Latino, and Al Hoke, who is Black. When Marquez could not find a set of truck keys and Herbert told him that they were in the truck, he began yelling at Herbert in Hoke's presence and stated that he intended to falsely accuse Herbert of yelling at him. Marquez then informed a warehouse manager that Herbert had yelled at him, but Hoke told the manager that in fact Marquez had yelled at Herbert. Herbert then told his supervisor, Construction Supervisor Jason Gilman, about the incident, but Gilman, who is white, told him to "leave it alone." *Id.* ¶ 29. When Herbert told Bagnall about the incident, she told him that she did not understand what he was trying to say and told him that if he had "an issue," he could file a formal complaint. *Id.* ¶ 30. At some point, Gilman spoke with Bagnall about the incident and then told Herbert again to "leave the situation alone." *Id.* ¶ 31.

In July 2019, Herbert was called into a meeting with Bagnall, Gilman, and Gilman's supervisor, Associate Director Roxene Kastens, who is Black. At the meeting, Herbert was issued a written reprimand for the incident with Marquez relating to the truck keys, even though the 30-day period for issuing discipline, as set forth in the University's policy and the applicable collective bargaining agreement, had expired. Marquez, who by then had taken extended leave for military duty, was not disciplined for the incident.

Over a year later, in October 2020, while walking to a meeting, Herbert and some co-workers were discussing and laughing about an incident when a fly landed on Vice President Mike

2

Pence during the recent debate between the vice presidential candidates in advance of the 2020 presidential election. When they entered the meeting room, a "former employee" named David, who is white, told Herbert to "shut up." *Id.* ¶ 37. Herbert replied that David should shut up. When Gilman, who had overheard the incident from across the hall, intervened, David responded that Herbert and his co-workers were "disrespecting" the Vice President. *Id.* ¶ 38. Approximately one week later, Herbert was subjected to an investigation into the incident, but no disciplinary action was taken.

The next year, in June 2021, Herbert was involved in another incident relating to keys. When Herbert attempted to check out the keys to his assigned work area in the boiler room of Cole Field House, Virginia Sherman, a white staff member responsible for the keys, refused to assist Herbert, asked co-workers to assist Herbert, and raised her voice and stated that she was "sick and tired" of Herbert and "can't help him." *Id.* ¶ 40. These co-workers were Michele Rychwalski, a Customer Response Center Manager, who is white; Debbie Florence, who is Latina; Christine Long, who is white; and Venice Hill. When they intervened, Hill arranged to give Herbert the correct set of keys. Herbert reported the incident to Gilman, but Gilman took no action.

Herbert then filed a union grievance in June 2021 against Sherman, Rychwalski, Long, and Kastens in which he alleged race discrimination and a hostile work environment. In the grievance proceedings, Long claimed that Herbert had refused to provide his name to Sherman when he was asking for the keys, a claim which Herbert asserts to be false. Long also threatened to ensure that Herbert would receive discipline relating to this incident. No action was taken as a result of the union grievance.

In August 2021, in an incident that Herbert deems to be retaliatory, Kastens accused Herbert of parking his car in an area that blocked access to others. Herbert asserts that this

3

allegation was untrue. Moreover, rather than directly speaking to Herbert about his car, Kastens notified Gilman and a foreman and asked them to tell Herbert to move his vehicle. Herbert alleges that by doing so, Kastens was unnecessarily suggesting to his supervisor that he was "doing something he was not supposed to be doing." *Id.* ¶ 48.

Finally, on April 7, 2022, when Herbert submitted paperwork relating to a job, the document he provided was damp. The foreman, who is white, "lashed out" at Herbert for submitting the damp paperwork. *Id.* ¶ 49. When Herbert reported the incident to Gilman, Gilman yelled that Herbert should "just come to work and do your fucking job." *Id.* ¶ 50. No action was taken against the foreman.

Herbert generally asserts that these "false accusations, curse-laden tirades, threats to his livelihood and discipline" are the result of discrimination based on race and disability and also constitute retaliation for his prior complaints of discriminatory treatment. He states that similarly situated employees who are not members of his protected classes are not subjected to similar treatment.

## II. Procedural History

Based on these incidents, Herbert submitted a charge of discrimination to the United States Equal Employment Opportunity Commission ("EEOC"). On August 17, 2021, the EEOC issued a letter to Herbert notifying him of his right to file a private civil action ("the Notice of Right to Sue" or "the Notice"). Although Herbert did not file the present action within 90 days of the issuance of the Notice, as required by Title VII, 42 U.S.C. § 2000e-5(f)(1), Herbert asserts that he never received the letter because of a series of thefts from his mailbox which occurred during the relevant time period. In or about September 2017, Herbert retained counsel, and as documented in printouts of emails attached to the Complaint, his attorney made multiple inquiries to the EEOC

about the status of the Notice, including on September 17, 2021, February 22, 2022, and March 29, 2022. On April 1, 2022, the EEOC finally informed Herbert's counsel that the Notice, which had first been posted to the EEOC's online portal, had been mailed out to Herbert on September 9, 2021. On April 4, 2022 and April 20, 2022, Herbert's counsel requested that the Notice be reissued. On April 20, 2022, the EEOC reissued the Notice, but it retained the date of September 9, 2021, which the EEOC stated was due to the fact that the Notice had been made available to Herbert through the EEOC's online portal, but Herbert had never opened that electronic version. Herbert filed suit in this Court on May 18, 2022 and filed his Amended Complaint on September 29, 2022.

In the Amended Complaint, Herbert alleges the following claims in the following numbered counts: (1) race discrimination based on disparate treatment, in violation of Title VII; (2) unlawful retaliation, in violation of Title VII and the ADA; and (3) race discrimination based on a hostile work environment, in violation of Title VII.

## DISCUSSION

In its Motion, the University seeks dismissal of all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). Specifically, it seeks dismissal on the grounds that (1) the Complaint was not filed within 90 days of the issuance of the Notice, as required by 42 U.S.C. § 2000e-5(f)(1); and (2) the allegations in the Amended Complaint are insufficient to support plausible claims of race discrimination, retaliation, and a hostile work environment under Title VII and the ADA. In opposing the Motion, Herbert asserts that he is entitled to equitable tolling of the statutory time limit for filing a complaint and that, under the standard applicable to a motion to dismiss, he has alleged sufficient facts to support each of his asserted claims.

I.  **Legal Standard**

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

II.  **Limitations Period**

The University first argues that Herbert's claims are time-barred because he filed his original Complaint more than 90 days after the issuance of the Notice. Under Title VII, as relevant here, a private civil action must be filed within 90 days of the issuance of a Notice of Right to Sue. *See* 42 U.S.C. § 2000e-5(f)(1). Although it is undisputed that Herbert did not comply with this requirement, the 90-day filing requirement is not a jurisdictional requirement and is "subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982). Equitable tolling is to be applied "only sparingly" and is not to be granted where a plaintiff "failed to exercise due diligence in preserving his legal rights." *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990). The United States Court of Appeals for the Fourth Circuit has adopted a "flexible rule" which requires "a thorough examination of the facts to determine if reasonable grounds exist for an equitable tolling of the filing period." *Harvey v. City of New Bern Police Dep't*, 813 F.2d 652, 654 (4th Cir. 1987).

Here, Herbert argues that his failure to file the original Complaint within 90 days of the issuance of the Notice should be excused because he never received the Notice, and it was likely stolen from his mailbox because he had previously been the victim of theft of mail. In support of this argument, Herbert submitted with the original Complaint a copy of a police hotline report and a United States Postal Service, Office of the Inspector General, investigative summary which describes a theft of various items from his mailbox in a different time period, in March 2022, that resulted in the cashing of a check stolen from Herbert's mailbox by someone other than Herbert. Herbert has also submitted emails showing that once he retained counsel in September 2021, the attorney made multiple inquiries to the EEOC asking when the Notice would be issued, actions that would not have occurred if the Herbert actually received the Notice through the mail. After three such inquiries, the EEOC finally stated, over six months later on April 1, 2022, that the Notice was mailed on September 9, 2021. Under these circumstances, and viewing the facts in the light most favorable to the nonmoving party as is required on a motion to dismiss, the Court finds that the allegations are sufficient to demonstrate that Herbert exercised "due diligence in preserving his legal rights." *Irwin*, 498 U.S. at 96.

The University argues that, because the Notice was posted to the "EEOC portal" before it was mailed out, Herbert had access to the Notice and thus was not reasonably diligent in preserving his rights. Mot. Dismiss at 9, ECF No. 14-1. The University cites no authority in support of its claim that posting a notice of the right to sue to an online portal is legally effective or is properly deemed to begin the 90-day period of 42 U.S.C. § 2000e-5(f)(1). Rather, the EEOC portal appears to be intended merely to provide status updates to "track the progress of [a] charge" for the benefit of employees and employer respondents. *See* "Checking the Status of Your Charge," Equal Employment Opportunity Commission, https://www.eeoc.gov/checking-status-your-charge (last

accessed June 27, 2023) (failing to state that the EEOC portal is intended to be the means by which legal notice or formal service of documents is to be provided). Indeed, the emails between Herbert's counsel and the EEOC reflect that the EEOC practice at the time was to mail such notices out if they are not accessed through the EEOC portal within 10 days of posting, thus demonstrating that even the EEOC did not consider such a posting to be sufficient to provide legal notice. Compl. Ex. A at 6, ECF No. 1-3.

In the end, the allegations in the Amended Complaint demonstrate that there is a plausible basis to conclude that Herbert did not receive actual notice through no fault of his own, that he and his counsel diligently sought information on the status of the Notice, and that they were thwarted by the EEOC's failure to provide responsive information for over six months. Because Herbert has alleged sufficient facts to support a plausible claim that equitable tolling is warranted, the Court will not dismiss the Amended Complaint as time-barred.

### III. Race Discrimination

The University argues that Herbert's Title VII claim of race discrimination based on disparate treatment should be dismissed for failure to state a claim. Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e-2. To assert a *prima facie* case of race discrimination based on disparate treatment, a plaintiff must allege "(1) membership in a protected class; (2) satisfactory work performance; (3) [an] adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 207 (4th Cir. 2019). The University argues that Herbert has not sufficiently alleged the third and fourth elements.

An adverse employment action is a discriminatory act that "adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). Examples include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion[.]" *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999). Here, none of the incidents recounted by Herbert as allegedly discriminatory resulted in such an adverse employment action. These incidents generally consisted of rude or disrespectful treatment by others, but none resulted in a demotion, decrease in pay or benefits, or loss of job title or responsibilities. In the incident with Bagnall, who refused to accept his paperwork relating to a return to full duty, the paperwork was accepted by other staff and he, in fact, returned to full duty. Likewise, in the incident with Sherman, other staff provided the keys that Herbert had sought from Sherman. Although during the incident with Kastens relating to parking, Kastens reported to Herbert's supervisor that he had parked improperly, Gilman took no adverse action against Herbert. As for the incident involving damp paperwork, while Herbert was treated rudely by a foreman, he received no discipline as a result of submitting the documents.

The only incident in which Herbert alleged any formal adverse consequences was the incident in which Marquez falsely accused Herbert of yelling at him, and Herbert later received a written reprimand. A written reprimand does not constitute an adverse employment action absent facts showing that it could result in a real employment injury, such as a specific impact on the plaintiff's, pay, job title, work responsibilities, or opportunities for promotion. *See Newman v. Giant Food, Inc.*, 187 F. Supp. 2d 524, 528–29 (D. Md. 2002) (holding that a counseling letter was not an adverse employment action with evidence that the warning could lead to further disciplinary action such as termination); *cf. Lewis v. Forest Pharmaceuticals, Inc.*, 217 F. Supp. 2d 638, 648

(D. Md. 2002) (in discussing "tangible employment actions" for purposes of a Title VII sexual harassment claim, finding that a written reprimand does not "significantly affect the terms or conditions of employment" absent "a real, rather than speculative, employment injury"). Herbert, however, has not specified the contents of the written reprimand or even whether it was placed in his personnel file. Significantly, he has not alleged facts demonstrating that the written reprimand could have had any adverse impact on his pay, job title, work responsibilities, or opportunities for promotion. Thus, Herbert has failed to allege that any of the incidents that he deems to constitute disparate treatment based on race resulted in an adverse employment action, as is necessary to state a viable Title VII race discrimination claim. The Court will therefore grant the Motion as to the race discrimination claim in Count 1.

### IV.    Retaliation

The University also asserts that Herbert has failed to state plausible claims of retaliation under Title VII and the ADA. Title VII makes it unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3. The ADA provides that "[n]o person shall discriminate against any individual because such individual ... made a charge ... under this Chapter." 42 U.S.C. § 12203(a).

The two statutes impose the same requirements for a plausible retaliation claim: (1) that the plaintiff engaged in a protected activity; (2) that the employer took a materially adverse action against the plaintiff; and (3) there was a causal link between the two events. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 271 (4th Cir. 2015) (Title VII retaliation); *A Society Without a Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011) (ADA retaliation).

10

On a Title VII claim, protected activity includes making an internal complaint about or otherwise opposing discrimination based one of the protected classes under Title VII, such as race, color, religion, sex, or national origin. *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981) ("To fall under the protection of the opposition clause in [Title VII's retaliation provision], behavior need not rise to the level of formal charges of discrimination.") For an ADA retaliation claim, the protected activity may consist of a complaint of or opposition to disability discrimination or a request for a reasonable accommodation. 42 U.S.C. §§ 12203(a), (b); *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 577 (4th Cir. 2015) ("[Plaintiff] clearly engaged in protected activity by submitting a request for accommodation."). Under both statutes, a materially adverse action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (Title VII); *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 430–31 (4th Cir. 2015) (incorporating *Burlington Northern*'s Title VII retaliation analysis into the ADA retaliation context).

**A.     Title VII**

To qualify as protected oppositional activity triggering Title VII's retaliation protections, an employee's complaints must communicate "a belief that the employer has engaged in ... a form of employment discrimination" based on a Title VII protected class. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009). In the Amended Complaint, Herbert identifies only one instance in which he complained of race discrimination or any other form of discrimination covered by Title VII: his June 2021 union grievance in which he alleged race discrimination arising from the incident in which Sherman refused to provide him with keys. In none of his prior complaints to his supervisor or others did he allege such discrimination. Thus,

none of the incidents up to and including the June 2021 incident with Sherman can be deemed to constitute unlawful retaliation under Title VII. *See Roberts v. Glenn Indus. Grp.*, 998 F.3d 111, 127 (4th Cir. 2021) (stating that a materially adverse action which does not "closely follow" a protected activity does not create an inference of retaliation).

The only subsequent incidents do not constitute materially adverse actions. Although Herbert contends that Long made false statements during the union grievance process following his June 2021 complaint and threatened Herbert with written discipline, Long's actions do not constitute materially adverse actions where Long was not Herbert's supervisor and Herbert received no discipline as a result of the incident with Sherman.

The August 2021 incident consisted only of Kastens asking Gilman and a foreman to tell Herbert to move his vehicle. Although a "materially adverse" action underlying a retaliation claim need not be a formal employment action such as a discharge, demotion, or loss of pay, this brief conversation, even though with Herbert's supervisor, does not rise to the level of a materially adverse action that would have "dissuaded a reasonable worker" from engaging in the protected activity, particularly where there is no claim that Gilman or anyone else took any action against Herbert as a result of the way he parked his car on that one occasion. *See Burlington N.*, 548 U.S. at 68. As for the April 2022 incident involving damp paperwork, the only consequences consisted of individual rude statements by the foreman who received the damp paperwork and by Gilman in response to Herbert's verbal complaint about the foreman's reaction. These comments, which resulted in no formal or informal discipline of any kind against Herbert, are insufficient to constitute materially adverse actions. *See id.* The Court will therefore grant the Motion as to the Title VII retaliation claim in Count 2.

**B.     ADA**

As for the ADA retaliation claim, Herbert asserts that after he requested and received a reasonable accommodation in the form of light duty after he had rotator cuff surgery, he was subjected to retaliatory actions beginning with the April 2019 incident in which Bagnall refused to accept a form required for him to return to full duty because it was signed by a nurse rather than a doctor. Where Herbert has acknowledged that his paperwork was accepted by other staff, and he has identified no other specific impact arising from this incident, the Court finds that it does not rise to the level of a materially adverse action. *See Burlington N.*, 548 U.S. at 68 (finding that "trivial harms," "petty slights," and "minor annoyances" do not constitute materially adverse actions). It is also not plausible that Bagnall's refusal to accept the paperwork was the result of dissatisfaction with his prior light duty, because the refusal to accept paperwork that would allow him to return to full duty would serve no purpose other than to prolong the light duty even longer.

As for the incident three months later, in July 2019, in which Marquez falsely accused Herbert of yelling at him and Herbert later received a written reprimand, Herbert has not alleged sufficient facts to support the inference that these actions were causally connected to his prior accommodation of working on light duty. By Herbert's own allegations, Marquez was unhappy about keys, not Herbert's light duty, and there are no allegations demonstrating that Marquez was even aware of that prior accommodation. The only way that the managers later involved in the reprimand—Bagnall, Gilman, and Kastens—were even aware of the incident is because Herbert reported it to them, and even then their initial reaction was not to discipline Herbert, but to tell him to leave the issue alone. Herbert has also alleged no facts connecting this action back to his request for light duty, which was actually approved and necessarily occurred over three months before, as he returned from light duty in April 2019. *See Roberts*, 998 F.3d at 127 (finding that under the

13

particular circumstances at issue, the three-month gap between the protected activity and the materially adverse action did not support a finding of a causal link). Under these circumstances, Herbert has not alleged a plausible ADA claim of retaliation based on his prior request for light duty.

As for the remaining incidents, they occurred between October 2020 and April 2022 and thus all took place over 18 months after his request for light duty. In the absence of any specific facts demonstrating a causal link between the request for an accommodation and these incidents, this temporal gap is too extended to support a plausible claim that these incidents were caused by Herbert's protected activity. *See id.*; *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (stating that a two and a half month gap between the protected activity and the materially adverse action "is sufficiently long so as to weaken significantly the inference of causation between the two events").

The Court therefore finds insufficient allegations to support a plausible claim of retaliation under the ADA in Count 2 and will thus grant the Motion as to that claim.

## V.  Hostile Work Environment

Finally, the University seeks dismissal of the Title VII hostile work environment claim in Count 3. A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015). To prove such a claim, a plaintiff must show that (1) the plaintiff experiences unwelcome harassment; (2) the harassment was based on the plaintiff's race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive atmosphere;

14

and (4) there is some basis for imposing liability on the employer. *Baqir v. Principi*, 434 F.3d 733, 745–46 (4th Cir. 2006). A court's determination whether such an environment exists includes a consideration of "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Boyer-Liberto*, 786 F.3d at 277. "[C]allous behavior by [one's] superiors," *Bass v. E.I. DuPont de Nemours & Co*, 324 F.3d 761, 765 (4th Cir. 2003), or "a routine difference of opinion and personality conflict with [one's] supervisor," *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000), in contrast, do not rise to the level of actionable harassment.

Here, Herbert's hostile work environment claim is based on six verbal altercations with other University personnel over a three-year period, from April 2019 to April 2022. Although clearly disturbing to Herbert, these incidents are not sufficiently severe or pervasive to support a claim of a hostile work environment based on race.

First, the six incidents, whether considered individually or collectively, were not sufficiently severe. They consisted of the April 2019 incident during which Bagnall refused to accept a medical form because a nurse signed it rather than a doctor; the July 2019 incident when Marquez, a co-worker, yelled at Herbert about missing keys and then accused him of yelling at Marquez; the October 2020 incident when a former employee named David told him to "shut up" because he discussed and laughed about a fly landing on the Vice President during a televised debate; the June 2021 incident in which Sherman refused to give him keys to his assigned work area; the August 2021 incident in which his second-level supervisor, Kastens, reported to his first-level supervisor, Gilman, that Herbert had parked in an improper location; and the April 2022 incident when Herbert was yelled at for submitting damp paperwork and for complaining about

the yelling. Though several incidents involved yelling and at least one involved profanity, none involved physical threats or assaults, none involved racially demeaning or insulting language, and none resulted in any discipline other than a written reprimand following the incident with Marquez. Only one, the April 2022 incident, actually involved any yelling by one of Herbert's supervisors. *See McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 410 (4th Cir. 2022) (in finding alleged harassment insufficiently severe and pervasive, relying in part on the fact that none of the incidents of racial harassment were perpetrated by a supervisor). These incidents fall below the level of severity necessary to support a hostile work environment claim. *See, e.g. Buchhagen v. ICF Int'l, Inc.*, 545 F. App'x 217, 219 (4th Cir. 2013) (stating that allegations of a supervisor mockingly yelling at the plaintiff in a meeting, "yelling and pounding her hands on her desk during another meeting," "repeatedly harping on a mistake" by the plaintiff, "making snide comments" to the plaintiff, "playing favorites with employees and pitting employees against each other," and "unfairly scrutinizing and criticizing" the plaintiff's use of leave and lack of compliance with directives all "fall[] far short of being severe or pervasive enough to establish an abusive environment"); *Khoury v. Meserve*, 268 F. Supp. 2d 600, 614 (D. Md. 2003) (finding that no hostile work environment was established where the plaintiff was subjected to ongoing "disrespectful, frustrating, critical, and unpleasant" treatment, including an incident when a supervisor "yelled at Plaintiff, told her she was incompetent, pushed her down in her chair, and blocked the door to prevent Plaintiff from leaving while he continued to yell at her"), *aff'd*, 85 F. App'x 960 (4th Cir. 2004).

As for pervasiveness, though the incidents span three years, they amount to two problematic incidents each year, which under the present facts are insufficient to demonstrate a pervasive pattern of harassment, particularly when considered alongside the limited severity of

each individual incident. *Perkins*, 936 F.3d at 210 (finding that where the offensive incidents were "remote in time relative to each other," the conduct was not sufficiently pervasive to create a hostile work environment.).

Lastly, Herbert offers virtually no facts that advance his claim that these incidents, individually or collectively, or the subsequent investigations by management, were motivated by race discrimination. He has not alleged any statements in which anyone referenced his race, much less any in which racially derogatory language was used. Although Herbert argues that racial animus can be inferred from the fact that Marquez and David, who are not Black, were not disciplined when they engaged in verbal altercations with Herbert, the allegations in the Amended Complaint demonstrate that Marquez and David were not active employees of the University at the time that investigations into the incidents occurred, and in any event Herbert received only a written reprimand after the Marquez incident and no discipline of any kind after the incident relating to David. Herbert has therefore failed to allege sufficient facts to support a plausible claim that any hostile work environment was motivated by race discrimination. *See Chang Lim v. Azar*, 310 F. Supp. 3d 588, 600 (D. Md. 2018) (dismissing a hostile work environment claim because of the plaintiff's failure to allege sufficient facts to support an inference that the alleged harassment was motivated by membership in a protected class).

Because Herbert has not alleged facts sufficient to demonstrate that he was subjected to racially motivated harassment that was sufficiently severe and pervasive to amount to a hostile work environment, the Court will grant the Motion to Dismiss as to the hostile work environment claim in Count 3.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss will be GRANTED, and the Complaint will be DISMISSED WITHOUT PREJUDICE. A separate Order shall issue.

Date: July 5, 2023

/s/ THEODORE D. CHUANG
United States District Judge